**FERRARA LAW GROUP, P.C.**
Ralph P. Ferrara, Esquire
Aaron L. Peskin, Esquire
50 W. State St., Suite 1100
Trenton, New Jersey 08608
(609) 571-3738
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Plaintiff:** <br><br> THOMAS PATIRE <br><br><br> vs. <br><br><br> **Defendants:** <br><br> ANIL DESHPANDE, LISA JACKSON, VITAS LABORATORY, LLC, MD GLOBAL, INC., ESA TOXICOLOGY, LLC, CHAD DAVID, DAVID BREWER, JOHN DOES 1-10, XYZ CORPORATIONS 1-100 <br><br> and <br><br> **Nominal Defendants** <br><br> UNIVERSAL CLINICAL LABORATORIES, LLC, MED MARK 2, LLC | CIVIL ACTION NO: <br><br><br> **COMPLAINT** |

Plaintiff Thomas Patire ("Plaintiff" or "Patire), by and through its counsel, Ferrara Law

Group, P.C., file this Complaint against Defendants Anil Deshpande ("Deshpande"), Lisa Jackson

("Jackson"), Vitas Laboratory, LLC ("Vitas"), MD Global, Inc. ("MD"), ESA Toxicology, LLC

("ESA"), Chad David ("David"), and David Brewer ("Brewer") John Does 1-10, and XYZ

Corporations 1-100 (collectively "Defendants") and Nominal Defendants Universal Clinical Laboratories, LLC (UCL) and Med Mark 2, LLC (MM2) and in support whereof state as follows:

## INTRODUCTION

1.      This is an action, brought both directly and derivatively for the benefit of UCL and MM2, against the other members of those two entities, as well as several other entities that conspired with those members to divert revenues away from UCL and MM2 and toward those individuals and entities.

2.      These actions were taken at the expense of Plaintiff, whose income from UCL and MM2 has dropped significantly in recent years due to mismanagement and/or fraud committed by Defendants Jackson and Desphande.

3.      During this time, Jackson and Deshpande effectively froze Plaintiff out of the management of both companies, refusing to hold board meetings and provide information that would allow Plaintiff to see the extent of their wrongdoing.

4.      Additionally, Jackson and Deshpande repeatedly attempted to dissuade Plaintiff from inquiring further as to the reason why both companies were losing money by make false statements as to a myriad of issues.

5.      Plaintiff has repeatedly sought a greater say or further information in order to take a more hands-on approach to running both companies, but has been repeatedly rebuffed by Jackson and Deshpande.

6.      Moreover, Jackson and Deshpande have also grossly mismanaged both companies, causing them to lose revenue.

7.      Plaintiff has invested significant sums in both companies, and has already paid significant out-of-pocket expenses on behalf of the companies based on misrepresentations from

2

Jackson and Deshpande regarding the companies' finances. He has not been reimbursed for those expenses.

8.　　　At a minimum, Deshpande and Jackson have breached their fiduciary duty to both Plaintiff, UCL, and MM2 through their mismanagement of the companies.

9.　　　At worst, Deshpande and Jackson, in concert with the other defendants, have actively defrauded Patire, UCL, and MM2 by diverting company assets for their own personal gain, thereby depriving Patire of the benefits of his ownership of those companies.

10.　　　In either case, Patire, UCL, and MM2 have been damaged and Defendants are jointly and severally liable for said damages.

**PARTIES**

11.　　　Plaintiff Thomas Patire is an adult individual rising in the State of New Jersey.

12.　　　Upon information and belief, Defendant Lisa Jackson is an adult individual residing at 168 Madison Court, Holland, Pennsylvania 18966.

13.　　　Upon information and belief, Defendant Anil Deshpande is an adult individual residing at 22 Delaney Drive, Newtown, PA 18940.

14.　　　Upon information and belief, Dr. Deshpande is licensed to practice medicine in Pennsylvania.

15.　　　Upon information and belief, Defendant Vitas Laboratory is an Arkansas Limited Liability Corporation with its principal place of business at 1311 Fort Street, Suite J, Barling, Arkansas 72923.

16.　　　Upon information and belief, Defendant MD Global 1228 E. 7th Avenue, Suite 200, Tampa, Florida 33605.

17.     Upon information and belief, Defendant ESA Toxicology, LLC is a Texas Limited Liability Corporation with its principal place of business at 2100 West Loop South, Suite 1200, Houston, Texas 77027.

18.     Upon information and belief, Defendant Chad David is an individual residing in Florida.

19.     Upon information and belief, Defendant David Brewer is an individual residing in Florida.

20.     David and Brewer are the owners of MD Global.

21.     John Does 1-10 are unidentified individuals that participated in the conduct set forth below.

22.     Companies A-Z are unidentified corporate entities that participated in the conduct set forth below.

23.     Nominal Defendant Universal Clinical Laboratories, LLC is a Pennsylvania Limited Liability Corporation with its principal place of business at 87 South Commerce Way, Bethlehem, PA 18017.

24.     Nominal Defendant Med Mark 2, LLC is a Pennsylvania Liability Company with its principal place of business at 168 Madison Court, Holland, Pennsylvania 18966.

## PERSONAL JURISDICTION

25.     This Court has personal jurisdiction over Defendants because as set forth below, Defendants regularly avail themselves of the laws of the State of New Jersey in connection with the business of UCL and MM2.

## SUBJECT MATTER JURISDICTION AND VENUE

26.     Pursuant to 28 U.S.C. § 1332(c), Patire is a citizen of New Jersey.

4

27.     Pursuant to 28 U.S.C. § 1332(c), Jackson is a citizen of Pennsylvania.

28.     Pursuant to 28 U.S.C. § 1332(c), Deshpande is a citizen of Pennsylvania.

29.     Pursuant to 28 U.S.C. § 1332(c), Vitas is a citizen of Arkansas

30.     Pursuant to 28 U.S.C. § 1332(c), MD Global is a citizen of Florida

31.     Pursuant to 28 U.S.C. § 1332(c), ESA Toxicology, LLC is a citizen of Texas.

32.     Pursuant to 28 U.S.C. § 1332(c), David is a citizen of Florida.

33.     Pursuant to 28 U.S.C. § 1332(c), Brewer is a citizen of Florida.

34.     Pursuant to 28 U.S.C. § 1332(c), UCL is a citizen of Pennsylvania.

35.     Pursuant to 28 U.S.C. § 1332(c), MM2 is a citizen of Pennsylvania.

36.     Because John Does 1-10 and XYZ Corporations 1-100 are unidentified fictitious defendants, no citizenship has been ascertained for those individuals and entities and their citizenship should therefore be disregarded in its entirety.

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity in citizenship exists between Plaintiff and all named Defendants (Plaintiff being a citizen of New Jersey and Defendants being citizens of Pennsylvania, Arkansas, Florida, and Texas, respectively), and the amount in controversy exceeds $75,000.

38.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims for relief under the Federal RICO statute 18 U.S.C. § 1962.  The Court also has jurisdiction over Plaintiffs' supplemental claims pursuant to 28 U.S.C. § 1367(a).

39.     Venue is proper in the District of New Jersey under 28 U.S.C. §1391, as the events and/or omissions giving rise to Plaintiffs' claims occurred in New Jersey.

## FACTS

### A. UCL

40.     UCL was formed in January 2016 by Deshpande, and Warren Melick ("Melick").

41.     In May 2016, Patire was added as a partner in UCL

42.     As of May 2016, Melick and Deshpande each held 37.5% of UCL and Patire held the remaining 25%.

43.     Patire's initial capital contribution to UCL was $250,000.

44.     UCL was founded as an independent clinical laboratory for the purpose of laboratory specimen test collections, specimen processing, specimen storage and specimen interpretation of the test results.

45.     When UCL was founded, Melick, Deshpande, and Patire were all listed as managers in the operating agreement.

46.     Although she did not own any stake in UCL at the time of its formation, Jackson was also listed as a manager.

47.     Upon information and belief, Jackson and Deshpande had a longstanding relationship prior to the formation of UCL.

48.     Upon information and belief, Jackson previously acted as Deshpande's office manager when he was in private practice as a medical doctor and Deshpande has relied extensively on Jackson to manage his business affairs, including but not limited to, UCL and MM2.

49.     In September 2016, UCL purchased Lehigh Valley Toxicology, LLC ("Lehigh") from POL Consulting Group, LLC.

50.     Upon information and belief, Deshpande, Jackson, Melick, and Zachary Melick (Melick's son), were members of POL.

51.     After the purchase of Lehigh, Deshpande and Melick each held 35% of UCL, while Patire held 20%, and Jackson and Melick each held 5%.

52.     Shortly after the acquisition of Lehigh, Deshpande and Jackson seized control of UCL and excluded the other managers, including Plaintiff, from participating in the day-to-day operations of UCL.

53.     Deshpande and Jackson suspended Melick from management from the company and terminated Zachary Melick from his employment at UCL.

54.     Melick sued UCL, Deshpande, Jackson, and Plaintiff in June 2017 regarding his exclusion from company management.

55.     Melick eventually settled that suit in early 2018, and as part of the terms of that suit, Deshpande purchased his membership interest as well as the membership interest held by Zachary Melick.

56.     Although Melick accused Patire of conspiring with Jackson and Deshpande to exclude him from the management of UCL, in fact nothing could have been further from the truth.

57.     In fact, Jackson and Deshpande had also excluded Patire from the management of UCL during this time despite Patire's best efforts to become actively involved in company affairs.

58.     Patire would repeatedly try to hold board meetings as required under the UCL operating agreement, but was told by Deshpande that board meetings are for big companies, not small companies.

59.     Every time that Patire was able to procure a meeting with the other members of UCL, it was always in an informal location, such as a restaurant, and Deshpande would insist that there was no need for corporate formalities, and that the meeting should not be considered an official board meeting.

60.     Patire would even try to bring itemized agendas to the meetings in order to provide some sort of organization, but Deshpande and Jackson would ignore those agendas.

61.     Patire has also requested information from Deshpande and Jackson, such as tax documents, financial records, or any other information that would allow him to determine if there were ways to improve company performance.

62.     Deshpande and Jackson have refused to provide him with any of the requested information.

63.     Patire also requested Jackson to teach him how the billing system worked and while Jackson would repeatedly promise to do so, she never followed up.

64.     Indeed, as discussed *infra*, when Patire requested a business valuation for the purpose of discussing a potential buy-out, Deshpande and Jackson refused to provide one.

65.     Simply put, despite being a manager pursuant to the UCL operating agreement, Patire has been shut out of day to day operation of the company and is almost entirely in the dark as to how the company has been run since the acquisition of Lehigh Valley Toxicology.

66.     Additionally, since the acquisition, UCL and Lehigh have both seen a steep decline in revenue despite the fact that neither has seen a significant drop in the number of samples that have been processed.

67.     In 2016, UCL/Lehigh had approximately $7 million in revenue, while in 2017, it has less than $2 million.

68.     In an effort to take on a more active role in company management and to determine the cause of the shortfall in revenue, Patire hired an outside consultant at his own expense in 2017.

69.     That consultant discovered that at best, UCL and Lehigh were grossly mismanaged by Deshpande and Jackson and at worst, those individuals were actively engaged in a myriad of unlawful schemes at Patire's expense.

70.     UCL and Lehigh's primary business functions are to operate as core laboratories.

71.     They collect and analyze medical specimens, such as blood and urine.

72.     They do this through a network of collection centers located all over the country.

73.     Patients go to the collection centers to provide samples and those collection centers in turn send those samples to UCL for processing and analysis.

74.     UCL/Lehigh procures the samples through a network of marketing representatives that will sell and market UCL/Lehigh's services on its behalf.

75.     With regard to UCL/Lehigh, it entered into several relationships with various representatives.

76.     When the patient enters a collection center to provide a specimen, that center obtains a signed HIPPA release, on behalf of UCL or Lehigh, notifying the patient of the name of the clinical lab obtaining, processing and billing for the services, and takes certain demographic information from the patient (name, date of birth, gender, insurer, etc.) along with the prescription or signed order by the referring doctor identifying the test requested, and enters it into an online portal.

77.     The specimen is then labeled individually, prepared for transport or processing.

78.     The information for that patient is then entered into a LIS (Laboratory Information System) portal either by the physician, physician staff, phlebotomist or by the lab technician, at the time of service or the time of receipt of processing.

79.     The LIS portal is not public and a portal user must possess a valid login and password in order to access the patient information.

80.     In the healthcare industry, the parties that have access to the portal are typically the collection center, the core laboratory, and the billing agent.

81.     With regard to UCL/Lehigh, until recently it used Prevalent, Inc. as its billing agent.

82.     Prevalent conducts daily sweeps of UCL/Lehigh's portal to obtain patient demographics, patients diagnosis, doctors' orders, patient's insurance information, and results of testing.

83.     UCL/Lehigh were recognized and approved as a participating provider with various insurance carriers. Those insurance carriers provide a fee schedule for services rendered by a Current Procedural Terminology (CPT) code, which is used industry-wide.

84.     The in-network provider and UCL/Lehigh would sign a binding agreement containing certain terms, including a fee schedule.

85.     UCL/Lehigh were not in-network providers with many carriers, as carrier contracts were not obtained, resulting in out-of-network fees for lab services.

86.     When UCL/Lehigh are in-network, insurer will send the payment directly to UCL/Lehigh.

87.     When UCL//Lehigh are out of network, if the insurer approves the service, it will either send the payment directly to the patient, who is responsible for paying UCL/Lehigh, or it would apply out of network responsibility to patient, leaving the patient responsible for the entire bill including the deductible and/or co-payment that applied.

88.     Alternatively, the insurer would pay the UCL/Lehigh an out-network fee for services rendered identifying any patients responsibility on the explanation of benefits, or the carrier would deny the claim completely, with denial code/comment "no out of network coverage for this facility for procedure performed."

89.     Upon information and belief, although Deshpande owned a majority of the membership interest of UCL after the settlement with Melick, he delegated day-to-day management of UCL/Lehigh to Jackson, whom he referred to as the "CEO."

90.     In late 2017, Prevalent terminated its relationship with UCL/Lehigh as billing agent, ostensibly because UCL owed over $100,000 to Prevalent and had not paid outstanding invoices.

91.     Patire found this curious because although he had been excluded from company management, he had taken an active role in securing sales and marketing representatives to act on UCL's behalf.

92.     Through Patire's extensive efforts, he procured (through the sales and marketing representatives) over $8 million in work, assuming that UCL/Lehigh would be properly compensated for that work.

93.     In actuality, UCL/Lehigh were never paid for much of this work through a combination of gross incompetence and fraud on the part of Jackson, with Deshpande's either tacit or explicit consent.

94.     As noted above, after Prevalent terminated its relationship with UCL/Lehigh, Patire hired, at his own expense, an outside consultant to determine if there were problems at UCL/Lehigh that could be fixed in order to right the ship.

95.     The consultant first discovered that Jackson grossly under-qualified to identify the billing issues, which resulted in the mismanagement of the day-to-day billing and receivables operations, which is the core of UCL/Lehigh's business.

96.     As noted above, insurers pay in-network providers directly and pay out-of-network providers through the patients, who are in turn responsible for paying the provider.

97.     In the case of UCL/Lehigh, the consultant found that there was $800,000 in out of network checks generated and paid to the patient, or denied as patient's responsibility, as uncollected or pursued by UCL/Lehigh, under the management of Jackson. This was identified via generated reports from the Prevalent billing software of payment posting done by the Prevalent staff dating as far back as 2016-thru end of 2018.

98.     Additionally, the consultant identified via billing reports generated from dates of services from 2016 through December 2017 over $1 million dollars of uncollected patient co-insurances, deductibles or patient responsibility identified by the insurance carrier. Such receivables were not collected or forwarded to a collection agency.

99.     When the consultant discussed the matter with Jackson, she simply stated that she expected the billing company to perform that task on UCL/Lehigh's behalf.

100.     However, Jackson did not supply the necessary information to allow Prevalent to accomplish this task, nor did she ever raise this issue with Prevalent.

101.     Jackson never generated month-end reports to show claims, electronic payments, or any sort of paper trail from collection to billing for each patient as it typical in the industry.

102.     All of this information would have been available through a clearinghouse, in this case two called Zirmed and Navinet, but Jackson claimed that she did not have access as the only authorized users where assigned to the billing company Prevalent.

103.     When the consultant questioned this, as this is very uncommon in the industry since the common practice is to always have access to their claims, Jackson stated she never once checked or had access to Zirmed.

104.     This is in spite of the fact that all assignments of benefits are the direct responsibility of the billing entity, in this case UCL/Lehigh.

105.     Jackson also claimed that she did not know how to generate such a report, and when one was provided to her, she blamed Prevalent for not effectively communicating the the severity of the outstanding aged receivables.

106.     Rather, she merely sent bank statements to Prevalent, which is highly unusual and would not account for the failure to procure patient payments from out-of-network insurers as discussed above.

107.     Jackson mismanaged the affairs of UCL/Lehigh in several other respects.

108.     For instance, she failed to collect co-payments due directly from patients.

109.     Patire offered to retain the services of a debt collection agency to collect co-payments, but Jackson and Deshpande voted down Patire's proposal and claimed it was not worth the effort.

110.     Additionally, she failed to pay the rent for UCL/Lehigh's offices for over a year, incorrectly assuming that UCL/Lehigh had been given a year of free rent.

111.     She also failed to promptly pay vendors.

112.     Patire discovered this when he received a notice stating that UCL/Lehigh had defaulted on payments for certain medical equipment that he had signed for.

113.     This was the only medical equipment that he had signed for, and had he not done so, he would have no way of knowing if UCL/Lehigh were in default.

114.     As noted above, Patire alone brought in over $8 million in revenue to UCL/Lehigh, yet they have always operated at a loss.

115.     Patire requested that Jackson acquire Quickbooks so as to better manage the financial affairs of UCL/Lehigh, yet she refused to do so.

116.     Although Desphande was initially amenable to acquiring Quickbooks, he quickly changed his mind once Jackson stated that she did not require it.

117.     Patire also requested access to UCL/Lehigh's bank statements.

118.     Jackson would provide the passcode to Patire, but not the security question, leaving Patire unable to access the account information.

119.     Patire repeatedly requested the security question answer from Jackson, but it was never provided.

120.     Simply put, at best Jackson was grossly incompetent in managing the business affairs of UCL/Lehigh.

121.     More importantly, Jackson resisted all efforts by Patire to further involve himself in the business in an effort to "right the ship."

122.     Yet, Patire's consultant soon discovered that Jackson and Deshpande's malfeasance went beyond simple incompetence and/or enabling of same.

123.     In fact, upon information and belief, Jackson and Deshpande were actively diverting funds from UCL/Lehigh and to their personal accounts through an agreement with Vitas and MD.

124.     As noted above, UCL/Lehigh are in-network with some insurers and out of network with other insurers.

125.     The in-network insurers for UCL/Lehigh tend to be carriers that have fewer insureds and UCL/Lehigh's region.

126.     However, UCL/Lehigh were not providers for all plans. Some of the out of network plans resulted in higher reimbursed payments to the facility, payment to the patient, or resulted in denied claims as the panels were closed or the patient did not have access or permissible payments for out of network providers.

127.     Thus, the out of network payers would pay patients directly rather than pay UCL/Lehigh, leaving UCL/Lehigh to chase after those patients for payment.

128.     Patire's consultant was told by Deshpande and Jackson that in order to circumvent the fact that UCL/Lehigh were out of network with the larger insurers, it had entered into an agreement with Vitas and MD Global wherein Vitas would submit claims to better payers under its own name.

129.     Upon information and belief, Vitas is a core laboratory located in Arkansas.

130.     On its website, Vitas proclaims "Yes! We Are in Network!"

131.     Upon information and belief, Vitas has a national network contract with many insurance companies for which UCL/Lehigh are out of network.

132.     MD Global is Vitas's management company and entered into the agreement with UCL on behalf of Vitas.

133.     In exchange for allowing Vitas to submit claims under its name for services performed by UCL/Lehigh, UCL agreed that Vitas would take a percentage of the payment received from the insurer and pass the rest along to UCL/Lehigh.

134.     This arrangement in and of itself is problematic because it is essentially a method of defrauding insurers into paying for services under the assumption that they were performed by an in-network provider when in fact the services were performed by an out of network provider.

135.     Put another way, the claims were reimbursed to a provider that did not perform the services, and were reimbursed at a higher rate versus customary and reasonable rates established for independent labs in Pennsylvania, where UCL/Lehigh operate

136.     However, in this particular instance, the arrangement was doubly problematic because Patire's consultant found no records whatsoever of payments from Vitas to UCL, nor was she provided access to the portal to identify who was being billed and processed thru Vitas. In addition, the Explanations of Benefits that the consultant requested were never supplied.

137.     In fact, while Jackson had informed Patire that UCL/Lehigh's collection rate was over 50% prior to the arrangement with Vitas/MD Global, after the commencement of that arrangement, the collection rate dropped to 18%.

138.     When Patire's consultant asked Jackson about this issue, she was told that Jackson had no access to Vitas nor did she have any reports or records of payment from Vitas and Vitas did not provide a portal as of yet.  When asked how she kept track of what is being sent to

Vitas, Jackson did not provide any information to the consultant as it was her position that she could not provide such information.

139.    The only party with direct communication with Vitas was Jackson.

140.    In fact, Jackson and Patire were submitting a significant amount of UCL/Lehigh's claims to Vitas, which would in turn procure payment from the insurers.

141.    But rather than submit payments to UCL/Lehigh, upon information and belief Vitas would pay Deshpande and Jackson directly.

142.    As a result, UCL/Lehigh would not realize the revenues that they should have earned from these claims, and in turn, Patire was deprived of his proportionate share of the profits that would have been realized by UCL/Lehigh had Vitas paid it for those claims.

143.    When asked about why so many claims had not been paid, Jackson's only explanation was that those claims had been denied.

144.    Of course, if Jackson's explanations were truthful, she would have had no way of knowing that her claims were denied since she would not be able to access the information necessary to make that determination.

145.    When the consultant asked Jackson to perform an internal audit in order to confirm that the specimens collected were billed and tied into the Prevelant billing system, she was unable to perform the audit, stating that the number in the LIS system did not match.

146.    An LIS system/portal is for the management and workflow of a lab facility.  Its functionality is for the data management of any lab specimen/patient and processing.  It stores data of historical lab results and and patient demographics and ties into an EMR billing software that is HIPPA compliant.

147.    Yet, she made no effort to determine where those claims or specimens actually went.

148.    UCL/Lehigh had a unique comprehensive system, yet Jackson could not provide the requested reports to Mr. Patire, nor could she tie in the numbers, or provide audited reports

149.    Again, the only two possible explanations for Jackon's inability to ascertain this information is that she was not able to do so (i.e. she was incompetent) or she was unwilling to do so (i.e. she was concealing her own wrongdoing or someone else's).

150.    Jackson did not provide Patire with any proof of denial or other records that would show that those claims were submitted to insurers, either directly from UCL/Lehigh or through Vitas.

151.    In addition to the agreement with Vitas, ESA was listed as a provider in UCL's billing software and upon information and belief, claims were submitted under ESA's name in a manner similar to UCL.

152.    When Patire and his consultant inquired about this, Jackson attributed the inclusion of ESA on UCL's billing software to an error by Prevalent as a result of the acquisition of Lehigh, or was electronically transferred when Prevalent moved its services to India, and said that Prevalent would remove ESA from the system.

153.    However, in order to enter a provider, information must be entered manually. As such, Jackson's excuse as to Prevalent's transition to India is not credible.

154.    The lack of credibility is made all the more clear by the fact that Jackson and Deshpande refused to raise the issue with Prevalent beyond simply removing ESA from the billing software.

155.     Jackson and Deshpande did not seem at all concerned with any potential HIPAA violations, nor were they concerned that ESA may have received some payments that should have been paid to UCL/Lehigh.

156.     If Prevalent did in fact make the error, it would be liable to UCL/Lehigh for any claims paid to ESA.

157.     Rather, upon information and belief, ESA was in fact added as an extra provider by Jackson, again for the purpose of submit in-network claims through that provider and/or diverting funds from UCL/Lehigh to Jackson and Deshpande's personal accounts.

158.     During this period, although Lehigh was processing a large number of toxicology samples, very few, if any, were submitted to Prevalent for payment.

159.     Instead, upon information and belief, it appears that these claims were submitted under ESA's name in order to procure in-network payments.

160.     Because Jackson and Deshpande have refused to provide any information to Patire, it is unknown if ESA was actually removed from the portal.

**B. <u>MM2</u>**

161.     In addition to UCL, Patire is owns 50% of MM2.

162.     MM2 was formed in February 2017 as the management company for UCL.

163.     Patire and Jackson each own 50% of UCL, although Deshpande funded a significant portion of MM2.

164.     MM2 was founded to secure sales and marketing agreements in states where UCL/Lehigh were not licensed to do business.

165.     As a result, many of the sales and marketing agreements executed on UCL's behalf were in fact executed by MM2.

166.    In order to maintain corporate formalities, Patire, Deshpande, and Jackson agreed that UCL would pay a management fee to MM2 for those accounts managed by MM2.

167.    However, much like UCL, Jackson has taken complete control of MM2 and has refused to involved Patire in any of the day to day operations.

168.    She has done with either the tacit or explicit consent of Deshpande, who exercises true authority over the company even though he has no interest in MM2.

169.    Deshpande's accountant formed the company and used his bank to open a checking account.

170.    Again, Patire has repeatedly requested to become more involved in MM2, but has been rebuffed each time.

171.    For instance, Patire requested access to MM2's bank accounts.

172.    Jackson would provide the necessary code to Patire, but would not provide the answer to the security question.  As a result Patire could not access MM2's account.

173.    Additionally, Jackson has mismanaged MM2 in much the same manner as she has UCL.

174.    Patire has received little, if any, income from MM2 despite the fact that that entity is responsible for the majority of the sales and marketing reps working on UCL's behalf.

175.    As discussed above, Patire has worked to bring in approximately $8 million in business for UCL.

176.    If most of the claims were paid as they should have been, MM2 would have seen significant revenue and profits due to the fact that it manages most of the corporate representatives.

177.    Instead, MM2 incurred in a loss in 2017 and continues to lose money in 2018.

178.     Furthermore, Jackson has diverted not just funds but representatives to the unlawful Vitas/MD Global enterprise.

179.     For example, Jackson signed an override deal with MM2's best representative so that he could go work directly on behalf of MD Global rather than on behalf of MM2.

180.     Since Jackson was a 50% owner of MM2, there was absolutely no reason for her to divert one of MM2's best representatives to a company that was not even affiliated with either UCL or MM2 unless there was some sort of private agreement between Jackson/Deshpande and Vitas/MD Global.

181.     Jackson also refused to pay many of MM2's representatives (or UCL's direct representatives for that matter).

182.     She would only pay the ones that she liked on a personal level.

183.     As for the others, she would falsely state that the claims were denied as UCL was only obligated to pay commissions on monies received.

184.     As a result, both UCL and MM2 have incurred outstanding liabilities against several of their respective representatives that have not been paid for their services

**C. Patire's Other Damages**

185.     In addition to the issues set forth above, Patire has been damages in two other respects.

186.     First, due to what he perceived as negative cashflow, Patire paid many of UCL's and MM2's expenses out of his personal funds.

187.     Most of the payments made by Patire were to UCL and MM2's representatives to ensure that they would not seek other relationships and continue working to bring in business for UCL.

188.    Patire also incurred significant expenses traveling all over the country to meet with representatives and smooth things over after Jackson refused to pay them.

189.    Jackson and Deshpande have refused to reimburse Patire for these expenses even though he incurred them on behalf of the company and in order to keep the representatives from leaving for other opportunities.

190.    Additionally, Deshpande, Jackson, and Patire entered into an oral agreement wherein Patire would be given an additional 10% of UCL once he brought in 2,500 specimens per month.

191.    Patire has achieved that number, but Deshpande and Jackson have refused to convey the 10% of LLC as promised

## D. **Futility**

192.    As noted above, Patire brings certain claims derivatively in the right and for the benefit of UCL and MM2 to redress injuries suffered, and to be suffered, by UCL and MM2 as a direct result of Jackson and Deshpande's mismanagement and fraudulent activity.

193.    Patire is a member of UCL, was a member of UCL at the time of the wrongdoing alleged herein, and has been a member of UCL continuously since that time.

194.    Patire is a member of MM2, was a member of MM2 at the time of the wrongdoing alleged herein, and has been a member of MM2 continuously since that time.

195.    UCL is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Prosecution of this action, independent of the controlling interests of Deshpande and Jackson, is in the best interests of UCL.

196.     MM2 is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Prosecution of this action, independent of the controlling interests of Deshpande and Jackson, is in the best interests of MM2.

197.     The wrongful acts complained of herein subject, and will continue to subject, UCL and MM2 to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

198.     The wrongful acts complained of herein were unlawfully concealed from Patire.

199.     As a result of the facts set forth herein, Patire has not made any demand on Deshpande and Jackson to institute this action since demand would be a futile and useless act.

200.     Deshpande and Jackson are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, especially in light of their wrongdoing.

201.     The wrongful acts complained of herein show multiple breaches by Deshpande and Jackson of their individual fiduciary duties of loyalty, due care, and oversight, and also show fraudulent and potentially criminal conduct on the part of Deshpande and Jackson.

202.     Furthermore, Patire has repeatedly attempted to take a more active role in both UCL and MM2, only to be rebuffed by Jackson and Deshpande each time.

203.     Jackson and Deshpande have benefited, and will continue to benefit, from their illegal schemes alleged herein and are incapable of exercising independent objective judgment in deciding whether to bring this action.

204.     Since Deshpande and Jackson hold a controlling interest in UCL, such a demand would be futile and pointless.

205.     Additionally, although Patire owns a 50% interest in MM2, he has been frozen out of management of that company by Deshpande and Jackson and as such, making a demand upon MM2 to institute this action would be similarly futile.

## COUNT I
**(Breach of Written Contract – Direct Claim against Deshpande and Jackson)**

206.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

207.     Plaintiff entered into a written agreement with Deshpande and Jackson regarding the operation of UCL (the "Operating Agreement").

208.     The Operating Agreement named Patire as a manager of UCL and required that the members of UCL meet no fewer than six (6) times per year.

209.     The Operating Agreement also required that the managers meet six (6) times per year as well.

210.     Deshpande and Jackson breached that agreement in several respects as set forth above.

211.     Deshpande and Jackson excluded Patire from management of the company.

212.     Deshpande and Jackson also refused to conduct regularly scheduled meetings as required under the Operating Agreement.

213.     As a result of Deshpande and Jackson's various breaches, Patire has been damaged.

**WHEREFORE,** Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande and Lisa Jackson in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT II
### (Dissolution of UCL and Appointment of Receiver – Direct Claim against Deshpande and Jackson)

214.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

215.    In light of the facts alleged above, it is not reasonably practicable to carry out the activities and affairs of UCL in conformity with the Certificate of Organization or the Operating Agreement.

216.    Furthermore, Deshpande and Jackson have acted and continue to act in a manner that is illegal and fraudulent as well as oppressive and directly harmful to Patire.

217.    Accordingly, UCL should be dissolved in accordance with 15 Pa. C.S.A. § 8871(a)(4).

218.    The oppressive, willful, and unlawful actions of Deshpande and Jackson constitute good cause for appointment of a judicially supervised receiver to wind up the affairs of UCL under 15 Pa. C.S.A. § 8872(e)(1).

219.    Alternatively, a receiver should be appointed under 15 Pa. C.S.A. § 8871(e)(3) in connection with this judicial proceeding for dissolution.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter an Order a) declaring that UCL is dissolved pursuant to 15 Pa. C.S.A. § 8871(a)(4); b) appointing a receiver to wind up the affairs of UCL in accordance with 15 Pa. C.S.A. § 8872(e)(1) and/or (e)(3); c) directing the receiver to prepare a full and complete accounting of the management of the affairs of UCL; d) awarding Patire the fair value for his interest in UCL prior to the oppressive actions of Deshpande and Jackson; and e) granting such other relief as the Court deems just and appropriate.

## COUNT III
### (Dissolution of MM2 and Appointment of Receiver – Direct Claim against Deshpande and Jackson)

220. Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

221. In light of the facts alleged above, it is not reasonably practicable to carry out the activities and affairs of MM2 in conformity with the Certificate of Organization or the Operating Agreement.

222. Furthermore, Deshpande and Jackson have acted and continue to act in a manner that is illegal and fraudulent as well as oppressive and directly harmful to Patire.

223. Accordingly, MM2 should be dissolved in accordance with 15 Pa. C.S.A. § 8871(a)(4).

224. The oppressive, willful, and unlawful actions of Deshpande and Jackson constitute good cause for appointment of a judicially supervised receiver to wind up the affairs of MM2 under 15 Pa. C.S.A. § 8872(e)(1).

225. Alternatively, a receiver should be appointed under 15 Pa. C.S.A. § 8871(e)(3) in connection with this judicial proceeding for dissolution.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter an Order a) declaring that MM2 is dissolved pursuant to 15 Pa. C.S.A. § 8871(a)(4); b) appointing a receiver to wind up the affairs of MM2 in accordance with 15 Pa. C.S.A. § 8872(e)(1) and/or (e)(3); c) directing the receiver to prepare a full and complete accounting of the management of the affairs of MM2; d) awarding Patire the fair value for his interest in MM2 prior to the oppressive actions of Deshpande and Jackson; and e) granting such other relief as the Court deems just and proper.

## COUNT IV
### (Breach of Oral Contract – Direct Claim against Deshpande and Jackson)

226.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

227.    Plaintiff entered into an oral agreement with Deshpande and Jackson regarding his share of UCL.

228.    Plaintiff, Deshpande, and Jackson agreed that upon reaching a goal of 2,500 specimens per month, Plaintiff would be given an additional 10% of UCL.

229.    Plaintiff has accomplished that goal, but Deshpande and Jackson have refused to convey the additional 10% of UCL.

230.    As such, Deshpande and Jackson have breached the oral agreement.

231.    As a result of Deshpande and Jackson's breach, Patire has been damaged.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande and Lisa Jackson in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT IV
### (Promissory Estoppel – Direct Claim against Deshpande and Jackson)

232.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

233.    Deshpande and Jackson promised to convey 10% of UCL to him should he reach the benchmark of 2,500 specimens per month.

234.    Deshpande and Jackson made that promise with the expectation that Patire would undertake his best efforts to procure those specimens.

235.    Patire reasonably relied on Deshpande and Jackson's promise and spent a significant amount of time and resources meeting with and entering into agreements with sales and marketing representatives in order to procure those specimens.

236.    Patire did in fact accomplish the goal of procuring 2,500 specimens, but Desphande and Jackson have refused to convey the additional 10% of UCL as promised.

237.    As a result of Deshpande and Jackson's breach, Patire has been damaged.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande and Lisa Jackson in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

### <u>COUNT V</u>
**(Breach of Fiduciary Duty – Direct Claim against Deshpande and Jackson)**

238.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

239.    Deshpande and Jackson, in bad faith, have knowingly, willfully, and recklessly violated fiduciary duties of good faith, loyalty, and due care owed to Plaintiff and have put their own personal interests ahead of the interests of Plaintiff, to whom they owed a duty as a fellow member of both UCL and MM2.

240.    As owners and managers of UCL and MM2, Deshpande and Jackson owe fiduciary duties of care, loyalty, and good faith to the other members of those companies, which in this particular instance is just Plaintiff.

241.    Deshpande's fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of UCL and MM2's respective businesses, to discharge their actions in good faith, to act in the best interests of UCL, MM2, and Patire, and to put the interests of UCL and MM2 above their own.

242.     As set forth above, Deshpande and Jackson breached their fiduciary duty of care by among other things, routinely mismanaging UCL and MM2.

243.     As set forth above, Deshpande and Jackson breached their fiduciary duties of good faith and loyalty by entering into arrangements with Vitas/MD Global and ESA to divert funds away from UCL and/or MM2 for their own personal benefit.

244.     Plaintiff has been damaged by Deshpande and Jackson's breach of their fiduciary duties.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande and Lisa Jackson in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT VI
### (Breach of Fiduciary Duty – Derivative Claim against Deshpande and Jackson)

245.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

246.     Deshpande and Jackson, in bad faith, have knowingly, willfully, and recklessly violated fiduciary duties of good faith, loyalty, and due care owed to UCL and MM2 and have put their own personal interests ahead of the interests of the respective companies.

247.     As owners and managers of UCL and MM2, Deshpande and Jackson owe fiduciary duties of care, loyalty, and good faith to those companies.

248.     Deshpande's fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of UCL and MM2's respective businesses, to discharge their actions in good faith, to act in the best interests of UCL, MM2, and to put the interests of UCL and MM2 above their own.

249.     As set forth above, Deshpande and Jackson breached their fiduciary duty of care by among other things, routinely mismanaging UCL and MM2.

250.     As set forth above, Deshpande and Jackson breached their fiduciary duties of good faith and loyalty by entering into arrangements with Vitas/MD Global and ESA to divert funds away from UCL and/or MM2 for their own personal benefit.

251.     UCL and MM2 have both been damaged by Deshpande and Jackson's breach of their fiduciary duties.

**WHEREFORE**, Plaintiff Thomas Patire, on behalf of Nominal Defendants Universal Clinical Laboratories and Med Mark 2, respectfully requests that this Honorable Court enter an order holding Desphande and Jackson personally responsible for any judgment or settlement incurred by either UCL or MM2 against any third party arising from their breaches of fiduciary duty, and also enter judgment in their favor and against Defendants Anil Deshpande and Lisa Jackson in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## <u>COUNT VII</u>
**(Aiding and Abetting Breach of Fiduciary Duty – Direct Claim against Vitas, MD Global, ESA Toxicology, Chad David, and David Brewer)**

252.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

253.     As set forth above, Deshpande and Jackson breached their fiduciary duty of care by among other things, routinely mismanaging UCL and MM2.

254.     As set forth above, Deshpande and Jackson also breached their fiduciary duties of good faith and loyalty by entering into arrangements with Vitas/MD Global and ESA to divert funds away from UCL and/or MM2 for their own personal benefit.

255.     Vitas, MD Global, ESA Toxicology, David, and Brewer (the "Outside Actors") assisted Deshpande and Jackson in this misconduct, and the Outside Actors' assistance in the misconduct by Deshpande and Jackson was knowing and substantial.

256.     The Outside Actors were aware of their role as part of an overall illegal or tortious activity at the time they provided assistance.

257.     As a direct and proximate result of the breaches of duty aided and abetted by the Outside Actors, Plaintiff has been damaged.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT VIII
### (Aiding and Abetting Breach of Fiduciary Duty – Derivative Claim against Vitas, MD Global, ESA Toxicology, Chad David, and David Brewer)

258.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

259.     As set forth above, Deshpande and Jackson breached their fiduciary duty of care by among other things, routinely mismanaging UCL and MM2.

260.     As set forth above, Deshpande and Jackson also breached their fiduciary duties of good faith and loyalty by entering into arrangements with Vitas/MD Global and ESA to divert funds away from UCL and/or MM2 for their own personal benefit.

261.     Vitas, MD Global, ESA Toxicology, David, and Brewer (the "Outside Actors") assisted Deshpande and Jackson in this misconduct, and the Outside Actors' assistance in the misconduct by Deshpande and Jackson was knowing and substantial.

262.     The Outside Actors were aware of their role as part of an overall illegal or tortious activity at the time they provided assistance.

263.     As a direct and proximate result of the breaches of duty aided and abetted by the Outside Actors, UCL and MM2 have been damaged.

**WHEREFORE**, Plaintiff Thomas Patire, on behalf of Nominal Defendants Universal Clinical Laboratories and Med Mark 2, respectfully requests that this Honorable Court enter an order holding Defendants Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer personally responsible for any judgment or settlement incurred by either UCL or MM2 against any third party arising from the aforementioned conduct, and also enter judgment in their favor and against Defendants Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT IX
### (Fraud – Direct Claim against Deshpande and Jackson)

264.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

265.     As set forth above, Defendants Deshpande and Jackson made material misrepresentations and omissions to Plaintiffs of presently existing or past facts including, *inter alia*, UCL's submissions of claims to various insurers, access to various documents and repositories of information.

266.     Defendants Deshpande and Jackson knew that said misrepresentations and omissions were false, but intended that Patire rely on them and that Deshpande and Jackson obtain an undue advantage therefrom.

267.     Patire relied on said misrepresentations and omissions to his detriment.

268.     As a direct and proximate result, Patire has been damaged.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande and Lisa Jackson in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT X
### (Violation of Civil RICO – Direct Claim against all Defendants)

269.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

270.     This claim arises under the Federal RICO statute, 18 U.S.C. § 1962.

271.     Defendants are persons as defined by 18 U.S.C. § 1961.

272.     The Enterprise is, pursuant to 18 U.S.C. § 1961, an enterprise and/or association and/or conspiracy in fact, formed to engage in activities which would and did affect interstate and intrastate commerce.  Defendants used the Enterprise to defraud Plaintiff as well as the federal and state government and other persons, including various health insurers.  This activity was conducted pursuant to a pattern of racketeering activity to the detriment of Plaintiff.

273.     The purpose of this enterprise was, *inter alia*, to defraud Plaintiff.  The Defendants had operating and/or management power of the enterprise.

274.     The acts of racketeering were that defendants, *inter alia*, utilized the enterprise to defraud Plaintiff, to divert funds due to UCL and/or MM2 to the personal accounts of Deshpande and Jackson, to falsely represent to health insurers that claims being submitted were for services performed by an in-network provider when in fact the opposite was true, and making false and fraudulent statements to Plaintiff and various sales and marketing representatives regarding the status of claims submitted to insurers.

275.     The racketeering activities aforesaid which constitute predicate acts in a pattern of racketeering activity are criminal violations of N.J.S.A. 2C:21-4 (fraudulent records and financial statements); 2C:21-9 (fraudulent practices and misconduct by corporate officials); 2C:2-6 (complicity); 2C:20-2 (theft); 2C:20-4 (theft by deception); 2C:41-2(c) and (d) (engaging in a pattern of racketeering and conspiracy to engage in a pattern of racketeering); 18 Pa. C.S.A. § 4104 (fraudulent records and financial statements);   18 Pa. C.S.A. § 4107 (fraudulent business practices); 18 Pa. C.S.A. § 306 (complicity); 18 Pa. C.S.A. § 3903 (theft); 18 Pa. C.S.A. § 3922 (theft by deception); 18 Pa. C.S.A. § 911 (engaging in a pattern of racketeering and conspiracy to engage in a pattern of racketeering);;   18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1961 (c) and (d) (racketeer influenced and corrupt organizations).

276.     The enterprise concealed its malfeasance by making false statements regarding the status of claims, by refusing to provide Patire access to UCL and MM2 corporate information and hiding the diversion of funds through various kickback schemes with Vitas/MD Global, ESA Toxicology, and other unknown entities.

277.     The enterprise as described above had and has the intent to continue its pattern of racketeering activity causing loss, cost and damage to Plaintiff and is a proximate cause of injury to them. The criminal acts were interrelated by distinguishing characteristics, are not isolated incidents, and pose a threat of continuing criminal activity.

278.     The defendants knowingly conducted and conspired with each other to conduct and participate in the affairs of, and/or acquire an interest in and/or control of the enterprise described herein through a pattern of racketeering activity in violation of 18 U.S.C. § 1962. There have been at least two predicate acts of racketeering activity within the last ten years.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT XI
### (Conspiracy to Violate Civil RICO – Direct Claim against all Defendants)

279.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

280.     All defendants participated and agreed to participate in the foresaid illegal enterprise to defraud Plaintiffs. This constitutes an illegal conspiracy to violate the Federal RICO statute in violation of 18 U.S.C. § 1962(d).

281.     Defendants agreed, participated and conspired with each other to commit the following predicate acts: violations of N.J.S.A. 2C:21-4 (fraudulent records and financial statements); 2C:21-9 (fraudulent practices and misconduct by corporate officials); 2C:2-6 (complicity); 2C:20-2 (theft); 2C:20-4 (theft by deception); 2C:41-2(c) and (d) (engaging in a pattern of racketeering and conspiracy to engage in a pattern of racketeering); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1961 (c) and (d) (racketeer influenced and corrupt organizations).

282.     The enterprise as described above had and has the intent to continue its pattern of racketeering activity causing loss, cost and damage to Plaintiffs and is a proximate cause of injury to them. The criminal acts were interrelated by distinguishing characteristics, are not isolated incidents, and pose a threat of continued criminal activity.

283.    The purpose of this enterprise was, *inter alia*, to defraud Plaintiff.   The Defendants had operating and/or management power of the enterprise.

284.    The acts of racketeering were that defendants, *inter alia*, utilized the enterprise to defraud Plaintiff, to divert funds due to UCL and/or MM2 to the personal accounts of Deshpande and Jackson, to falsely represent to health insurers that claims being submitted were for services performed by an in-network provider when in fact the opposite was true, and making false and fraudulent statements to Plaintiff and various sales and marketing representatives regarding the status of claims submitted to insurers.

285.    The racketeering activities aforesaid which constitute predicate acts in a pattern of racketeering activity are criminal violations of N.J.S.A. 2C:21-4 (fraudulent records and financial statements); 2C:21-9 (fraudulent practices and misconduct by corporate officials); 2C:2-6 (complicity); 2C:20-2 (theft); 2C:20-4 (theft by deception); 2C:41-2(c) and (d) (engaging in a pattern of racketeering and conspiracy to engage in a pattern of racketeering); 18 Pa. C.S.A. § 4104 (fraudulent records and financial statements); 18 Pa. C.S.A. § 4107 (fraudulent business practices); 18 Pa. C.S.A. § 306 (complicity); 18 Pa. C.S.A. § 3903 (theft); 18 Pa. C.S.A. § 3922 (theft by deception); 18 Pa. C.S.A. § 911 (engaging in a pattern of racketeering and conspiracy to engage in a pattern of racketeering);;  18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1961 (c) and (d) (racketeer influenced and corrupt organizations).

286.    The defendants knowingly conducted and conspired with each other to conduct and participate in the affairs of, and/or acquire an interest in and/or control of the enterprise described herein through a pattern of racketeering activity in violation of 18 U.S.C. § 1962. There have been at least two predicate acts of racketeering activity within the last ten years.

287.     As a result of the foregoing, Plaintiff has been and continues to be substantially damaged and irreparably harmed.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper

## COUNT XII
**(Civil Conspiracy – Direct Claim against all Defendants)**

288.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

289.     At all times relevant hereto, all defendants, with a common purpose designed to damage Plaintiff, have engaged in a pattern of behavior to mislead and defraud Plaintiff.

290.     While not all defendants were involved with each other, Defendants Deshpande and Jackson acted in concert with each other and with each of the other defendants (or multiple other defendants together) in a series of conspiracies.

291.     During the course of the conspiracies, Defendants Deshpande and Jackson, acting in concert with each of the other defendants (or multiple other defendants together), engaged in numerous coordinated acts to further the purposes of the conspiracies, including but not limited to the acts described in the paragraphs of this Complaint, which are specifically incorporated herein.

292.     Each act of the conspiracies was ratified by the other co-conspirators, who acted as each other's agents in carrying out each conspiracy. Thus, each defendant is jointly and severally liable for the torts of the other members of each conspiracy which were committed in furtherance of the goals of the conspiracy.

293.    As a direct and proximate result of defendants' conduct, Plaintiff has been damaged

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

**COUNT XIII**
**(Civil Conspiracy – Derivative Claim against all Defendants)**

294.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

295.    At all times relevant hereto, all defendants, with a common purpose designed to damage UCL and MM2, have engaged in a pattern of behavior to divert company assets for their own benefit.

296.    While not all defendants were involved with each other, Defendants Deshpande and Jackson acted in concert with each other and with each of the other defendants (or multiple other defendants together) in a series of conspiracies.

297.    During the course of the conspiracies, Defendants Deshpande and Jackson, acting in concert with each of the other defendants (or multiple other defendants together), engaged in numerous coordinated acts to further the purposes of the conspiracies, including but not limited to the acts described in the paragraphs of this Complaint, which are specifically incorporated herein.

298.    Each act of the conspiracies was ratified by the other co-conspirators, who acted as each other's agents in carrying out each conspiracy. Thus, each defendant is jointly and severally

liable for the torts of the other members of each conspiracy which were committed in furtherance of the goals of the conspiracy.

299.     As a direct and proximate result of defendants' conduct, UCL and MM2 have been damaged

**WHEREFORE**, Plaintiff Thomas Patire, on behalf of Nominal Defendants Universal Clinical Laboratories and Med Mark 2, respectfully requests that this Honorable Court enter an order holding Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer personally responsible for any judgment or settlement incurred by either UCL or MM2 against any third party arising from the aforementioned conspiracy, and also enter judgment in their favor and against Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

**COUNT XIV**
**(Conversion – Direct Claim against all Defendants)**

300.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

301.     As aforestated, the defendants all intentionally and fraudulently engaged in various schemes to misappropriate the cash, assets, resources, and services of UCL and MM2 for their benefit and with the intent to deprive Plaintiff of his rights and interest in said cash, assets, resources and services.

302.     Plaintiff is entitled to immediate possession of all property and monies taken by the defendants that is rightfully owed to him by virtue of his ownership interest in UCL and MM2.

303.     The defendants have wrongfully interfered with Plaintiff's right to the aforementioned property and monies.

304.     As a direct and proximate result of the defendants' theft and conversion, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## COUNT XV
### (Conversion – Derivative Claim against all Defendants)

305.     Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

306.     As aforestated, the defendants all intentionally and fraudulently engaged in various schemes to misappropriate the cash, assets, resources, and services of UCL and MM2 for their benefit and with the intent to deprive UCL and MM2 of their rights and interest in said cash, assets, resources and services.

307.     UCL and MM2 are entitled to immediate possession of all property and monies taken by the defendants that is rightfully owed to them.

308.     The defendants have wrongfully interfered with UCL and MM2's right to the aforementioned property and monies.

309.     As a direct and proximate result of the defendants' theft and conversion, UCL and MM2 have been damaged.

**WHEREFORE,** Plaintiff Thomas Patire, on behalf of Nominal Defendants Universal Clinical Laboratories and Med Mark 2, respectfully requests that this Honorable Court enter an

order holding Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc.,

ESA Toxicology, LLC, Chad David, and David Brewer personally responsible for any judgment

or settlement incurred by either UCL or MM2 against any third party arising from the

aforementioned conspiracy, and also enter judgment in their favor and against Defendants Anil

Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad

David, and David Brewer in an amount exceeding $1,000,000 plus consequential and incidental

damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this

Court deems just and proper.

**COUNT XVI**
**(Usurpation of Corporate Opportunity – Derivative Claim against Deshpande and Jackson)**

310.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

311.    As aforestated, Deshpande and Jackson had a fiduciary duty to act in the best

interests of UCL and MM2.

312.    Deshpande and Jackson violated that duty by utilizing their positions to divert

business opportunities away from UCL and MM2 for their own personal benefit

313.    As a direct and proximate result of the Deshpande and Jackson's usurpation of

corporate opportunities, UCL and MM2 have been damaged.

**WHEREFORE**, Plaintiff Thomas Patire respectfully requests that this Honorable Court

enter judgment in its favor and against Defendants Anil Deshpande and Lisa Jackson in an amount

exceeding $1,000,000 plus consequential and incidental damages, interest, attorneys' fees, costs

of suit, punitive damages, and such other relief that this Court deems just and proper.

**COUNT XVII**
**(Unjust Enrichment – New Vista v. Deshpande and Jackson)**

314.    Plaintiff incorporates the preceding paragraphs as it set forth fully herein.

315.     As described above, Plaintiff bestowed benefits upon the Deshpande and Jackson by, *inter alia*, using personal for goods and services on behalf of UCL and MM2.

316.     Plaintiff's expenditures were necessitated by Deshpande and Jackson's gross mismanagement and/or fraudulent and unlawful conduct that served to deprive UCL and MM2 of the funds necessary to pay said expenses.

317.     While the defendants have retained the benefits provided by Plaintiff, at no time did the defendants provide a reciprocal benefit to Plaintiff in exchange.

318.     Retention of the benefits by Deshpande and Jackson would be unjust.  As a result, Deshpande and Jackson have been unjustly enriched.

**WHEREFORE,** Plaintiff Thomas Patire respectfully requests that this Honorable Court enter judgment in its favor and against Defendants Anil Deshpande, Lisa Jackson, Vitas Laboratory, LLC, MD Global, Inc., ESA Toxicology, LLC, Chad David, and David Brewer in an amount exceeding $100,000 plus consequential and incidental damages, interest, attorneys' fees, costs of suit, punitive damages, and such other relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by a jury on all issues of the within complaint.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I, Ralph P. Ferrara, Esquire, certify the following to be true and correct under penalty of perjury pursuant to 28 U.S.C. §1746:

Upon information and belief, the matter in controversy herein is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

**FERRARA LAW GROUP, P.C.**
Attorneys for the Plaintiff
Thomas Patire

By:_____

RALPH P. FERRARA, ESQUIRE
AARON L. PESKIN, ESQUIRE

Dated:  April 16, 2018